## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| TIMOTHY O'HERN, SEMYON RODKIN, and DOMINIC CARDINALE, Individually and On Behalf of All Others Similarly Situated, | CIVIL ACTION NO. |
| Plaintiffs, | |
| vs. | JURY TRIAL DEMANDED |
| VIDA LONGEVITY FUND, LP, VIDA MANAGEMENT I, LLC, VIDA CAPITAL MANAGEMENT, LLC, VIDA CAPITAL, INC., VIDA CAPITAL, LLC and JEFFREY R. SERRA, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs, by and through undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge.  Plaintiffs' information and belief are based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Vida Longevity Fund, LP ("Vida Longevity" or "the Fund") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of offering materials including the Private Placement Memoranda ("PPM") through which investments in the Fund were offered and sold to investors; (c) periodic reports and investor communications regarding the Fund; and (d) review of other publicly available information concerning the Fund and its related entities. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiffs bring this class action under the Texas Securities Act ("TSA") on behalf of all persons or entities who purchased or otherwise acquired investments in limited partnership interests in Vida Longevity, a Texas-based limited partnership, from the beginning of 2017 until the present (the "Class Period"), and suffered losses and damages in connection with their respective transactions in the Fund's limited partnership interests during the Class Period (the "Proposed Class").

2.      Vida Longevity is an open-ended investment fund that raises money from investors and invests that money in life settlements.  Life settlements are financial transactions that involve the purchase of life insurance policies at a discount to their face value for investment purposes. The Fund states that it looks to acquire longevity and longevity-backed assets and then hold them to term or sell them to interested parties on the secondary or tertiary market.  Since its inception on April 1, 2010, the Fund has raised over $1.8 billion.

3.      The Fund's stated objective is to achieve return of capital plus a cumulative compounded annualized return rate of approximately 8-12%, with ***low volatility*** and low correlation with the investment performance of traditional asset classes.

4.      The Fund purportedly achieved that targeted rate of return from its inception through 2017.  Then, in 2018, the Fund's performance began to substantially deteriorate to the extent that in 2020, the Fund posted a negative return of approximately 12.5% resulting in substantial investor losses.

5.      At the time, the Fund attributed the sub-par performance to certain one-time or extrinsic events.  Then, at the close of its third quarter 2020, the Fund revealed for the first time that its losses were caused by serious weaknesses in the Fund's internal processes and procedures

necessary for the evaluation and pricing of the Fund's investments, and thus required significant remedial actions.  Plaintiffs' Complaint alleges that Defendants violated the Texas Securities Act by misrepresenting and/or failing to disclose the serious weaknesses in the Fund's internal processes and procedures in the offering materials including the PPM through which investments in the Fund were offered and sold to investors.

6.      In addition, Plaintiffs allege that Defendants violated the TSA by failing to disclose material conflicts of interest regarding the Fund's founder, Defendant Jeffrey R. Serra ("Serra"). For example, as described in more detail herein, the offering materials failed to disclose that one of Serra's alternative investment funds – Ovation Partners, LP ("Ovation"), in which Serra was a 50% owner – was not only a competitor of Vida Longevity, because it too invested in life settlements, but was also systematically liquidating its $40,000,000 investment in the Fund during 2018 at the same time Serra was urging other investors to invest in the Fund.

7.      Plaintiffs allege that the omitted information was material to investors and should have been provided to investors prior to making a decision as to whether to invest in the Fund. Defendants misrepresentations and/or failure to disclose such material information caused substantial harm to Plaintiffs and members of the Proposed Class.

## PARTIES

### a)  Plaintiffs

7.      Plaintiff Timothy O'Hern is a resident of the Commonwealth of Kentucky.  Mr. O'Hern invested a substantial amount of money in the Fund during the Class Period and suffered significant losses and damages in connection with those transactions.

8.     Plaintiff Semyon Rodkin is a resident of the State of New York.  Mr. Rodkin invested a substantial amount of money in the Fund during the Class Period and suffered significant losses and damages in connection with those transactions.

9.     Plaintiff Dominic Cardinale is a resident of the State of New York.  Mr. Cardinale invested a substantial amount of money in the Fund during the Class Period and suffered significant losses and damages in connection with those transactions.

## b)  Defendants

### 1)  The Vida Entity Defendants

10.     Defendant Vida Longevity Fund, LP is a Delaware limited partnership formed on February 1, 2010 for the purpose of acquiring and managing a portfolio of life settlement assets for investment purposes.  The Fund's principal offices are located at 835 W. 6th Street, Suite 1400, Austin, Texas, out of which all Vida entities operate.

11.     Defendant Vida Management I, LLC (the "General Partner") is a Delaware limited liability company with its principal offices located at 835 W. 6th Street, Suite 1400, Austin, Texas. Vida Management I, LLC is the sole General Partner of the Fund.  The General Partner administers the day-to-day activities of the Fund's operations and manages the Fund's investment and business activities.  The Fund is controlled and advised by the General Partner.  The General Partner is empowered to exercise full discretion in the management of the investing transactions of the Fund and is solely responsible for researching, selecting, and monitoring investments by the Fund and making decisions concerning the Fund's portfolio.

12.     Defendant Vida Capital Management, LLC, ("Vida Management") is the control person of the General Partner.  Vida Management is a Delaware limited liability company registered as an investment advisor with the Securities and Exchange Commission ("SEC").

4

13.     Defendant Vida Capital, Inc., ("Vida, Inc.") is the control person of Vida Management. Vida, Inc. which is a Delaware corporation owned by Defendant Vida Capital, LLC and non-party JTC Longevity Investments, LTD, a British Virgin Islands business company.  Vida, Inc. was controlled by non-party Austin Ventures X LP and Defendant Jeffrey R. Serra until September 2019 when its existing shareholders sold a substantial majority of the equity of Vida, Inc. to affiliates of the non-party private investment firms Redbird Capital Partners Management LLC and Reverence Capital Partners, L.P.

14.     Defendant Vida Capital, LLC, ("Vida Capital"), is a Delaware limited liability company.

15.     Defendant Jeffrey R. Serra has served as the Fund's President and Chief Executive Officer ("CEO") since its founding.  In 2009, Serra also co-founded, with Austin Ventures X LP, Vida Capital, Inc.  Defendant Serra was instrumental in the creation of the Fund's false and misleading offering materials through which limited partnership interests in the Fund were offered and sold to Plaintiffs and the Proposed Class.  In October 2020, the Fund announced that Serra would retire as CEO of Vida in early 2021.

16.     Because of his positions at the Fund, and Vida Capital, Inc., Serra possessed the power and authority to control and did control the content and form of the Fund's Private Placement Memoranda, and other offering documents, periodic annual and quarterly reports, press releases and other materials provided to money and portfolio managers and investors. Serra authorized the publication of the documents and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false and misleading statements or to cause them to be corrected.  Because of his positions with the Fund,

and Vida Capital, Inc., Defendant Serra was also uniquely positioned to have access to the undisclosed material adverse facts specified herein.

2) **Relevant Non-Parties**

17.     Magna Life Settlements, Inc. ("Magna") is a Florida corporation whose sole shareholder is Vida, Inc.  Pursuant to an agreement between Magna and the Fund dated November 7, 2014 (the "Magna Origination Agreement"), Magna would facilitate the sale of life settlement assets to the Fund by originating, identifying, examining, reporting, and negotiating purchase terms of the assets.  Magna disclaims any fiduciary, agency or advisory relationship to the Fund, and is not responsible for ensuring the assets satisfy certain eligibility criteria or confirming the correctness of any models, including pricing models, life expectancy calculations, financial return forecasts or any tax matters.  According to the PPM, Magna would be permitted to advise and provide origination or other related services to clients other than the Fund, and a significant part of its current activities consist of advising and providing services to Vida Management-sponsored entities other than the Fund.

18.     Ovation Partners, LP ("Ovation") is Texas limited partnership founded by Defendant Serra and his partner Mike Rovner in 2010.  Ovation is managed by its General Partner, Ovation Management LLC.  Ovation is a registered investment advisor with the SEC offering investment advisory services to its clients through a variety of funds.  Defendant Serra is a limited partner, control person and 50% owner of Ovation.  Similar to the Fund, Ovation describes its investment strategy as emphasizing preservation of investor capital, providing quarterly distributions, and generating returns with low correlation to public markets.  According to Ovation, it invests in assets in the private credit and specialty finance markets, which may include tax lien transfer, real estate, life settlements, asset-backed loans, non-performing debt, commercial loans,

litigation finance and medical receivables finance.  Ovation operates out of the same offices as the Vida entities, at 835 W. 6th Street, Suite 1400, Austin, Texas.

## JURISDICTION AND VENUE

19.     Defendants Vida Longevity, the General Partner, Vida Management, and Vida Capital were formed as Delaware limited liability entities (both partnership and companies).  Defendant Vida, Inc. was formed as a Delaware corporation.   The Agreement of Limited Partnership, contained in the "Foundation Documents" through which each of the investments in the Fund were offered and sold to investors, contains a Consent to Jurisdiction clause, providing that "all actions or proceedings arising in connection with this Agreement shall be tried and litigated exclusively in the state and federal courts located in the State of Delaware."  Venue is therefore proper in this District.

21.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C §1332, because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and on information and belief, between 1/3 and 2/3 of the members of the Proposed Class are residents of states other than Texas.

## SUBSTANTIVE ALLEGATIONS

22.     Vida Longevity is an open-ended investment fund specializing in the life settlement industry.  Life settlements are financial transactions that involve the purchase of life insurance policies at a discount to their face value for investment purposes.  The Fund looks to acquire longevity and longevity-backed assets and then hold them to term or sell them to interested parties on the secondary or tertiary market.  Since its inception on April 1, 2010, the Fund has raised over $1.8 billion from investors.

23.     According to the Private Placement Memorandum attached to the Foundation Documents through which investments in the Fund were offered and sold to investors, the Fund defines life settlements as:

> [L]ife insurance policies insuring the lives of individuals who are generally at least 70 years of age at the time of the policy acquisition. To qualify as a Life Settlement for purposes of investment by the Fund, an insured generally must have a life expectancy ranging from not less than two years to not more than 15 years at the time of the policy acquisition, and the policy must be issued by a U.S. domiciled insurance company with a rating of B or above by A.M. Best or the equivalent at the time of policy acquisition.
>
> A viatical settlement or life settlement is the sale to a third party of an existing life insurance policy for more than its cash surrender values but less than its net death benefit. Regulatory usage of the terms "viatical settlement" and "life settlement" varies by state. However, the industry generally uses the term "viatical settlement" to refer to instances where the insured is terminally ill with a life expectancy of less than two years. A "Life Settlement" on the other hand, focuses on policies insuring older individuals (typically 70 or over) with life expectancies of at least two years. The Fund currently intends to focus on purchasing Life Settlements, however, the fund may purchase viatical settlements from time to time.

24.     The PPM touted life settlements as transactions that "can be mutually beneficial for both the seller and the buyer. The seller is able to sell the policy for more than the cash surrender value offered by his or her life insurance company, and the buyer is able to purchase an investment vehicle with a potentially attractive potential rate of return and little correlation to its other investments."

25.     According to the PPM, "the principal objective of the Fund are to (i) preserve the capital of the investors in the Fund, (ii) seek long-term appreciation in the value of the Fund's assets and (iii) target annualized investment returns of between 8-12% after payment of all fees and expenses of the Fund with a medium to long term investment period."

26.     The PPM touted the General Partner's acquisition and investment criteria stating that the Fund "plans to adhere to parameters with respect to the types of Life Settlements purchased

by the Fund, as well as the diversification of Life Settlements and the underwriting insurance carriers ("Eligibility Criteria").  The General Partner will formulate and implement Eligibility Criteria for purchases of Life Settlements in its sole discretion, and it will purchase Life Settlements outside of these Eligibility Criteria where it deems, in its sole discretion, that the investment would be appropriate."

27.     The PPM touted the Fund's ability to mitigate risk "through diversity of Longevity-Contingent Assets."  It then described how the Fund would limit the face value of any single policy to the aggregate of all policies owned by the Fund, limit the maximum exposure to any one insurance company, and limit the number of policies from carriers below an AM Best rating of A+.

28.     The PPM further touted the General Partner's ability to manage risk through its ongoing portfolio monitoring:

> Once an investment opportunity has been identified, the General Partner will evaluate the effect of adding such Longevity-Contingent Assets to the Fund's portfolio. The General Partner will monitor the Fund's portfolio on an ongoing basis to ensure that the investment thesis behind each Longevity-Contingent Asset is intact. The General Partner will further monitor positions in view of the Fund's portfolio as a whole in order to manage risk.

29.     The PPM emphasized the Fund's objective to achieve an annual rate of return of 8-12% with low volatility:

> Investment Merits:
>
> ***Reduced Risk to Capital; Regular Returns***
> It is the General Partner's objective for the Fund to achieve return of capital plus a cumulative compounded annualized return rate of approximately 8-12%, with ***low volatility*** and low correlation with the investment performance of traditional asset classes. There can be no assurance that the Fund's investment objectives will be achieved.
>
> (Emphasis added).

30.     The PPM further touted the Fund's due diligence process:

***Originator and Sourcing Agent***

The Fund will invest only in Life Settlements where the General partner believes that there is a clear expectation of payment upon policy maturity. The key to ensuring such payments is a ***rigorous due diligence process*** on the part of licensed and regulated companies that facilitate the sale of policies to investors by identifying, examining, and acquiring the policies as agent for the purchasers ("***Originators***"). To control and supervise the process, the Fund has entered into an origination agreement with Magna Life Settlements, Inc. ("***Magna***"), a wholly-owned subsidiary of Vida Inc. Magna is a licensed Originator that ***employs a detailed quality assurance program while evaluating and diligencing policies***. Magna is licensed or able to transact in all 50 U.S. states and has consistently been ranked as one of the top life settlement providers/originators in the country (footnote omitted). ***By working with an affiliated Originator, the Fund can verify that the policies it purchases are originated in strict adherence with state and federal laws and compliant with internal due diligence and quality assurance processes***. . . .

Additionally, all Longevity-Contingent Assets purchased by the Fund, whether or not originated by Magna, will be sourced through Vida Inc. Vida's broad network of contacts and relationships provide access to a large market of Longevity-Contingent Assets.

31.     From 2010 through 2017, the Fund met its objective of returning a compounded annualized return rate of approximately 8-12%. Then, in 2018, the Fund moved away from its reliance on third-party life expectancy providers and towards its own proprietary approaches to developing survivorship curves and to better understand long-term "intrinsic value" using the General Partner's own internal models, which changes it claimed were "in the best interest of the Fund" and would "enhance acquisition behavior and drive better investment outcomes and results for. . . investors."

32.     Notwithstanding, the Fund substantially underperformed in 2018 with an annual return of just 5.65%.  The Fund attributed the underperformance to a one-time event; the adjustment of "expectations" of cash flow in November 2018 to reflect updated models from life expectancy providers to correct for underperformance in maturity outcomes.

10

33.     However, the Fund's underperformance continued in 2019 with a first quarter return of just 1.12% and a trailing 12-month return of 4.83%.   The Fund attributed the underperformance to two factors: (1) maturity outcomes in February and March that were significantly less than expected, and (2) the negative impact from certain life expectancy updates. The Fund reminded investors that it adjusted "expectations" of cash flow in November 2018 to reflect updated models from life expectancy providers and therefore designed to correct for maturity outcome underperformance, and therefore, they "firmly believe these months to be anomalistic, and not reflective of forward expected outcomes," and that "deviations as significant as February have probabilities of less than 1 in 200 observations."   As to the second point, the Fund emphasized that the negative impact was due to policies it was not able to update in the fourth quarter 2018.   The Fund remained upbeat about its outlook and stood by its "guidance of being able to deliver an 8-12% net return over a reasonable hold period."

34.     Notwithstanding its upbeat assessment, the Fund continued to underperform in 2019 posting an annual return of just 5.49%.   The Fund attributed the continued underperformance to a significant deviation from expectations in terms of mortality outcomes that began in February 2019.

35.     By the second quarter of 2020, the Fund's returns turned negative.   In its Second Quarter 2020 Letter to Investors, the Fund reported a second quarter net return of negative 2.31% and a trailing 12-month net return of 1.32%.   According to the Letter, the underperformance was driven by a valuation adjustment in April, and also the impact of negative aging on the portfolio. The letter further stated that the Fund has "made significant improvements to our processes, underwriting, and risk teams," and that it was "taking steps to mitigate these effects and to better

balance the portfolio in order to produce consistent return outcomes more in-line with our stated objectives."

36.     Subsequent to the close of its third quarter 2020, the Fund revealed the true nature and extent of its problems.  In its Third Quarter 2020 Letter to Investors, the Fund reported a third quarter return of negative 0.33% and a trailing 12-month net return of negative 0.67%.  The letter revealed serious weaknesses in the Fund's internal processes and procedures necessary for the evaluation and pricing of the Fund's investments, thus requiring significant remedial actions.

37.     According to the Third Quarter 2020 Letter to Investors:

> [T]he various steps that we have taken to address performance of the portfolio have not gone quickly enough or been deep enough to fully offset the negative recent results. As you will see, we along with our Board have taken an exhaustive and comprehensive review of our policies and procedures, and personnel with a specific focus on risk and portfolio management which has resulted in the implementation of a substantial number of process and underwriting improvements.

38.     The letter further revealed that beginning in July 2020, the Fund acquired a new company, Avmont LLC, to restructure and improve the talent of its investment team, underwriting process and the process for pricing and evaluation life settlements that were in place for "the past two-plus years."  According to the letter, the Fund "undertook a highly focused review of the portfolio," noting that:

> Based on the outcome of the analysis that was performed, we determined the standard actuarial aging process we have historically used on the older age and older life expectancy cohorts results in mortality rates that appear to not align with the actual outcomes and thus drive the negative aging effects that are currently impacting the portfolio. As a response, we have implemented a process of updating all life expectancy reports on policies where the most recent report is greater than 36 months old. The newness of the life expectancies and health status information will produce a very clean portfolio with up-to-date health information which should strengthen portfolio and risk decision making.

> Life settlement gross performance is a function of asset returns less the carrying cost on the assets, which are primarily driven from (i) life expectancy updates, and

12

(ii) net aging on the portfolio (month-over-month change in asset value minus premiums paid). Collectively, these two "carrying cost" elements have dragged or reduced VLF's performance year-to-date by 4.26%. When these elements are combined with the valuation methodology update in April (a non-recurring event), performance has been negatively impacted by 7.66%. A more frequent and disciplined process of updating health information and life expectancy updates should mitigate much of the impact of these non-recurring items and will better align expected mortality with actual mortality. Our plan is to have all of our older life expectancy updates completed by the end of 2020 with any valuation impact flowing through the Fund's fourth quarter returns.

*       *       *

In October 2019, we transitioned to a new ownership group (Redbird Capital Partners and Reverence Capital Partners), who, in close consultation with the company's management, immediately began a deliberate process of transformation and process improvement across investment personnel and the life settlement underwriting team. An essential part of this transformation plan was to acquire the assets of Avmont LLC in July 2020, a firm with both an exceptional track record and a highly analytical and internally driven life settlement underwriting process. The thesis of the acquisition was to enhance the talent of the investment team and to complement and enhance the algorithmic processes ("***Delta***") which have underpinned our pricing and evaluation of life settlements for the past two-plus years.

*       *       *

Since becoming President and CIO earlier this year, both Jeff Serra and I have worked very closely with the company's Board to identify and make the necessary changes and investments in our people, processes and controls. Over the past six months we have (i) fully restructured the life settlement asset management organization with a particular focus on risk processes and establishing a clear separation between underwriting and origination, (ii) launched Delta 2.0, with much improved granularity and age-specific signals, (iii) closed the acquisition of Avmont, LLC, (iv) completed a 3-month "bottoms up" review of VLF, and (v) hired Jim Gereghty to oversee our non-life settlement investment activities.

*       *       *

Unfortunately, we estimate that the life expectancy updates along with certain sales that we have completed will result in approximately an 8-12% negative impact to performance in the 4th quarter.

*       *       *

13

It is difficult to communicate this message, and this has been a painful letter to write. Everyone at Vida knows the responsibility we have to you, our partners, and we share in your disappointment over the 2020 campaign. We will work tirelessly to rebuild your trust and believe these changes will translate into better and more consistent outcomes.

54.     In its Fourth Quarter 2020 Letter to Investors, the Fund announced results consistent with the expectations set forth in the Third Quarter 2020 Letter to Investors, reporting fourth quarter return of negative 10.72%, and year-end return of negative 12.66%.  According to the letter, "[t]wenty-twenty was a 'fix and correct' year with significant overhauls to our underwriting and risk processes, longevity inputs, and to our portfolio management team."

> At the risk of repetition, here are some of the actions that were undertaken in 2020:
> 1)  Restructured the life settlement underwriting and origination functions;
> 2)  Added fundamental underwriting to compliment the Delta algorithm;
> 3)  Upgraded portfolio management and risk teams;
> 4)  Disposed of unattractive risk/return assets; and
> 5)  Updated medical records and Life Expectancy ("*LE*") reports on a majority of the portfolio.

39.     As a result of the deficiencies in the Fund's processes and procedures for evaluating and pricing the Fund's assets, investors on the Fund have suffered significant harm to their investments.

**Material Misrepresentations/Non-disclosures: Lack of Adequate Processes and Procedures to Evaluate and Price the Fund's Investments**

40.     The PPM contained untrue statements of material fact and/or omitted information necessary to make the statements made not misleading. Specifically, the PPM misrepresented and failed to disclose that:

a.  The Fund failed to implement adequate underwriting procedures to properly determine mortality rates that align with actual outcomes, the result of which drove the negative aging effects that negatively impacted the portfolio;

b.  The Fund failed to implement adequate processes and procedures to adequately assess the risk of the Longevity-Contingent Assets it was

14

acquiring;

c.  The Fund failed to update the life expectancies ("LE") on its Longevity-Contingent Assets on a frequent enough basis to adequately value those Assets for the portfolio;

d.  The Fund failed to ensure adequate separation between its underwriting and origination functions to ensure there were no conflicts of interests;

e.  The Fund did not have adequate personnel in place on its portfolio management and risk teams; and

f.  The Fund's algorithmic processes referred to as "Delta," implemented prior to 2020 ("two-plus years" ago), which underpinned its pricing and evaluation of life settlements, was inadequate.

**Material Non-Disclosures: The Failure to Disclose Significant Conflicts of Interest**

41.    While the PPM distributed to the Fund investors disclosed that Defendant Serra was also a co-founder of Ovation, which it describes as an alternative investment manager, it failed to disclose significant conflicts of interest, including that:

a.  Ovation was a competitor of Vida Longevity, because it too invested in life settlements, among other assets;

b.  Serra was the principal of both Ovation and Vida Longevity, and thus he was conflicted. The known, specific conflict was not disclosed; rather, the PPM disclosed that the Vida Longevity managers "are not restricted from … engaging in other business activities [that] may be in competition with the Fund" and that Serra "serves as the principal of another investment advisory firm that manages multi-strategy private investment funds."  The PPM, however, failed to disclose that Ovation actually invested in life settlements, just like Vida Longevity, not just in "multi-strategy" funds;

c.  Ovation was also an investor in Vida Longevity, in a magnitude of over $40,000,000;                                                                    and

d.  Ovation – in which Serra had invested his own capital – pulled out its investment from Vida Longevity in 2018 while the Fund was in the midst of raising new money from investors. In other words, Serra withdrew his own capital from Vida Longevity that he had invested through Ovation, while urging other investors to invest in the Fund. The

withdrawals occurred in 2018, in three tranches, and represented substantial amounts of the total withdrawals during those reporting periods: 45%, 70%, and 26% of the total withdrawals, respectively.

42.     The PPM failed to disclose other important conflicts of interest arising out of Serra's affiliation with and control of both Vida Longevity and Ovation, including:

a.  Both Vida Longevity and Ovation used the same life settlement feeder entity (Magna) to acquire life settlements. Magna was owned/controlled by Vida Longevity meaning that Serra had to decide to which of the two competitors to allocate the most profitable life settlements;

b.  Both Vida Longevity and Ovation raised money from investors at the same time, and in fact shared some of the same investors;

c.  Both Vida Longevity and Ovation used some of the same broker-dealer firms to raise money from investors (*i.e.*, there is a partial overlap between the two syndicates of broker-dealers that raised money for the two entities); and

d.  Ovation and Vida Longevity shared the same office space in Austin, and it appears they also shared some employees.

43.     The omitted information was material to investors in the Fund as important information investors should have been provided in making the decision whether to invest in the Fund.

## CLASS ACTION ALLEGATIONS

44.     This action is brought by Plaintiffs, for themselves and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

## CLASS DEFINITION

45.     The Proposed Class is defined as follows: All persons and entities that purchased or otherwise acquired an investment in limited partnership interests in the Fund pursuant to an offering of those partnership interests from the beginning of 2017 until the present, and suffered

losses and damages in connection with their respective transactions in the Fund's limited partnership interests during the Class Period.

46.     Excluded from the Proposed Class are: (1) Any of the Defendants, their agents or employees; (2) any judge or judicial officer who may hear any aspect of this case and his or her law clerks; and (3) any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

## NUMEROSITY

47.     The members of the Proposed Class are so numerous and geographically dispersed that joinder of all members is impracticable.  The exact number of Fund investors is within the knowledge of Defendants.

## TYPICALITY

48.      The claims of Plaintiffs are typical of the claims of all Proposed Class members. Plaintiffs are situated identically to all members of the Proposed Class with respect to the issues presented in this case, as Plaintiffs and all members of the Proposed Class were investors in the Fund and suffered the exact same loss (in proportion to the amount of their investment).  The claims of Plaintiffs are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Proposed Class.

49.     All investors in the Fund have been adversely affected by the wrongdoing of Defendants as described herein.

## COMMONALITY

50.     There are common questions of law and fact in this class action that relate to and affect the rights of each member of the Proposed Class including, *inter alia*:

> a.  Whether Defendants failed to disclose that the Fund did not have adequate underwriting procedures to properly determine mortality rates

that align with actual outcomes, the result of which drove the negative aging effects that negatively impacted the portfolio;

b. Whether Defendants failed to disclose that the Fund failed to implement adequate processes and procedures to adequately assess the risk of the Longevity-Contingent Assets it was acquiring;

c. Whether Defendants failed to disclose that the Fund failed to update the life expectancies ("LE") on its Longevity-Contingent Assets on a frequent enough basis to adequately value those Assets for the portfolio;

d. Whether Defendants failed to disclose that the Fund failed to ensure adequate separation between its underwriting and origination functions to ensure there were no conflicts of interests;

e. Whether Defendants failed to disclose that the Fund did not have adequate personnel in place on its portfolio management and risk teams;

f. Whether Defendants failed to disclose that the Fund's algorithmic processes referred to as "Delta," which underpinned its pricing and evaluation of life settlements, was wholly inadequate; and

g. Whether Defendants failed to disclose the significant conflicts of interest identified herein.

## ADEQUACY

51.     The representative parties and undersigned counsel will fairly and adequately protect the interests of the Proposed Class.

52.     Plaintiffs also satisfy Rule 23(b) of the Federal Rules of Civil Procedure because the questions of law or fact common to the members of the Proposed Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## LEGAL CLAIMS

## COUNT I

### Texas Securities Act, Tex. Rev. Civ. Art. 581-33-A

### Fraudulent Sale

**Vida Longevity**

53.     Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

54.     The Texas Securities Act ("TSA"), Tex. Rev. Stat. Art. 581-33-A, provides, in

pertinent part:

> A. ***Liability of Sellers***. (A)(2) ***Untruth or Omission***. A person who offers or sells a
> security (whether or not the security or transaction is exempt under Section 5 or 6
> of this Act) by means of an untrue statement of a material fact or an omission to
> state a material fact necessary in order to make the statements made, in the light of
> the circumstances under which they are made, not misleading, is liable to the person
> buying the security from him, who may sue either at law or in equity for rescission,
> or for damages if the buyer no longer owns the security.

55.     As alleged herein, the Fund offered or sold securities to Plaintiffs and the Proposed

Class by means of untrue statements of material fact and by its omission to state material facts

necessary in order to make the statements made, in the light of the circumstances under which they

were made, not misleading.

## COUNT II

### Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(1)

### Control Person Liability

### General Partner and Serra

56.     Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

57.     The TSA, Tex. Rev. Stat. Art. 581-33-F(1), provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**

(1) A person who directly or indirectly controls a seller, buyer, or issuer of a
security is liable under Section 33A, 33B, or 33C jointly and severally with the
seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or
issuer, unless the controlling person sustains the burden of proof that he did not
know, and in the exercise of reasonable care could not have known, of the existence
of the facts by reason of which the liability is alleged to exist.

19

58.     A person is liable as a "control person" where he or she has the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Depending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a parent company, and a management company.

59.     As alleged herein, the Fund offered or sold securities to Plaintiffs and the Proposed Class by means of untrue statements of material fact and by its omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

60.     At all relevant times, the General Partner was empowered to exercise full discretion in the management of the investing transactions of the Fund and was solely responsible for researching, selecting, and monitoring investments by the Fund and making decisions concerning the Fund's portfolio.  Moreover, Defendant Serra served as the Fund's President and CEO at all relevant times.  In these capacities, both the General Partner and Serra directly or indirectly possessed the power to direct or cause the direction of the management or policies of the Fund, and accordingly directed and controlled the Fund's misconduct and knew or should have known of such misconduct.

61.     The General Partner and Serra are jointly and severally liable with the Fund for violation of TSA.

## COUNT III

**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(2)**

**Materially Aiding Violations of the Texas Securities Act Art. 581-33(A)(2)**

**Vida Management, Vida, Inc., and Vida Capital**

Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

62.     The TSA, Tex. Rev. Civ. Art. 581-33-F(2),  provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

63.     To establish liability for aiding fraud under TSA, a plaintiff must demonstrate:

(1) a primary violation of the securities laws occurred;

(2) the alleged aider had "general awareness" of its role in this violation;

(3) the actor rendered "substantial assistance" in this violation; and

(4) that the alleged aider either (a) intended to deceive the plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator.

64.     An aider may be held liable where it rendered assistance "in the face of a perceived risk" and must possess "a general awareness that his role was part of an overall activity that is improper."

65.     As alleged herein, the Fund committed primary violations by offering or selling securities to Plaintiffs and the Proposed Class by means of untrue statements of material fact and by their omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

66.     As the advisors, partners, and managers to the Fund, Defendants Vida Management, Vida, Inc., and Vida Capital recklessly or knowingly participated in the Fund's scheme, as discussed *supra*, while being generally aware that the Fund's Class Period statements were

materially false and misleading and that the Fund's offerings were therefore made in violation of TSA.

67.     Defendants Vida Management, Vida, Inc., and Vida Capital provided substantial assistance to the Fund in their oversight and control of the management, research, selection, and monitoring of the investing transactions of the Fund.

68.     Defendants Vida Management, Vida, Inc., and Vida Capital are therefore jointly and severally liable with the Fund for violation of TSA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the Proposed Class, pray for judgment as follows:

(a) Certifying this action as a class action pursuant to Fed. R. Civ. Proc. Rule 23(b)(3);

(b) Certifying Plaintiffs as class representative and appointing the under-signed counsel as class counsel;

(c) Awarding rescission and/or rescissory damages against the Fund, in favor of Plaintiffs and the members of the Proposed Class, including interest;

(d) Awarding compensatory damages in favor of Plaintiffs and the members of the Proposed Class against all Defendants, including interest;

(e) Awarding punitive damages in favor of Plaintiffs and the members of the Proposed Class against all Defendants;

(f) Awarding Plaintiffs their reasonable attorneys' fees and costs; and

(h) Granting such other and further relief as the Court may deem just and proper.

**II.     JURY DEMAND**

Plaintiffs demand a trial by jury for all issues triable thereby.

Date: March 19, 2021

Respectfully submitted,

 _s/ Ned Weinberger_
Ned Weinberger (DE Bar ID #5256)
LABATON SUCHAROW LLP
300 Delaware Avenue, Suite 1340
Wilmington, DE 19801
Telephone: (302) 573-2540
Email: nweinberger@labaton.com

Francis P. McConville (*pro hac vice
forthcoming*)
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Email: fmcconville@labaton.com

Alan L. Rosca (*pro hac vice forthcoming*)
GOLDMAN SCARLATO & PENNY PC
23250 Chagrin Blvd., Suite 100
Beachwood, OH 44122
Telephone: (484) 342-0700
Email: rosca@lawgsp.com

Mark Goldman (*pro hac vice forthcoming*)
Paul Scarlato (*pro hac vice forthcoming*)
GOLDMAN SCARLATO & PENNY PC
Eight Tower Bridge, 161 Washington St
Conshohocken, PA 19428
Telephone: (484) 342-0700
Email: goldman@lawgsp.com
          scarlato@lawgsp.com

***Counsel for Plaintiffs***